May it please the Court, my name is Jonathan Montag and I'm representing Ms. Galina Mikhaleva. This is an asylum case coming from the Immigration Court and the BIA, the Board of Immigration Appeals, and we contend that Ms. Mikhaleva meets all the elements for a grant of asylum and it was erroneous by the immigration judge and the BIA to deny her a grant of asylum. Among the elements of asylum is that she has to show a fear of past persecution and a well-founded fear of future persecution, and we contend that what happened to her, having been fired from her job, been sexually assaulted, and then threats to her life and threats to psychological commitment, and then her family members, including her child being kicked out of school and beaten up, meet the elements. If you consider them cumulatively, the violence and the harassment meet the elements of a grant of asylum. Now, the immigration judge and the BIA characterized what happened to her as harassment and not asylum, and also said that the sexual assault couldn't be tied to her religious beliefs. And I think the Court, in some of its decisions, has seen that the nature of a form of persecution can give the Court the indicia that that persecution was because of one of the protecting factors. What is there in the record that leads you to believe that the mental health practitioner who assaulted her client did so because she was a Jehovah's Witness? Well, firstly, she says in her declaration that while this was happening, he was insulting her religion, and afterwards there were phone calls to her telling her that she would be committed to a psychological institution if she didn't stop with her religion. You think that he would not have been so sexually aggressive with this woman if she'd been a member of another faith? Well, that's where the issue of the obvious signs comes in. And a recent case in this the practice was to shoot them in the rear. The Court found that that was an indication that the people were persecuting homosexuals because of the nature of what they did. The record shows that the use of psychologists to deter and to punish and to harass and persecute people in religion occurs in Russia, and historically it has. So, therefore, to have a psychiatrist involved... And what historically has happened is they typically sexually assault these people? Is that what you're telling us the record shows? No, but the psychologists do other things when they commit them to institutions, and she indicated she feared that after a month in an institution she would become a basket case. Was she institutionalized? She was not, but she also fled the country before anything could happen. Counsel, as I hear you, you are arguing that there is evidence in the record from which the IJ could have concluded that this sexual assault was on account of her religion. The question, and that may be so, the question before us, however, is whether or not the record compels the conclusion that this sexual assault rose to the level of persecution on account of her religion. That is the burden that has to be met, I think. Now, how do you meet that burden? Well, I would say from the context that it would. Firstly, from what was said to her, why she was there in her old employer's office was because she had been fired for her religion. And then this unusual event occurred to her, and at the time there were utterances about her religious beliefs. Afterwards, then she received phone calls also relating to psychology, commitment, and her religious beliefs, and the fact that she knew that they use religion in that country as a way to intimidate people for their religion, and it was a very symbolic act to have a psychologist there who had the power to commit her, to do this to her as a way to deter her from her religious practice. What was the relationship between the psychologist and her employer? All that the record contains is that he was a private psychologist who was brought there that day to give her a psychological evaluation before they'd give her her back pay. There's nothing else in the record to indicate that he was an employee of them. But I don't think that the intimidating value of having a psychologist there, when psychologists and religion are intertwined as a form of persecution. I don't understand the role of private practitioners, psychology, or psychiatrist, or whatever he was. Are they government employees? Are they licensed by the government? What did the government have to do with the authority of this psychiatrist to have her committed? Well, the record reflects that the newspapers for which she worked were controlled by an editor whose husband was a powerful man in the Russian government. And it appears from the record, and there is nothing explicit about it, that the psychologist has the authority to commit somebody. And so the way an electrician has the power to redline and shut down your house. Well, there are a lot of anecdotal, over the years, a lot of anecdotal reports in the media that the Soviet government, at least during the Stalin and immediately post-Stalin period, used psychiatric methods to control various kinds of dissidents or people who were disfavored by the government. Does she claim that she was disfavored by the government, or just that her boss didn't like her religion? She's claiming that it was by a government or people that the government were unwilling to protect her from. Because she was in a prominent role as a writer, and she was also writing and editing a Jehovah's Witness newspaper, and she was being suppressed by elements that either independently of the government or with the acquiescence of the government were hostile to her behavior and wanted to change it And I'd add that the record does reflect that even in modern times, not just in the times of Stalin, that religion is used as a suppress, that psychology is used as a suppressive measure against religious dissidents or people who aren't orthodox. Now, why should we ignore the evidence in the record that the Jehovah's Witnesses have been able to hold their own or expand during this period of time in Russia? Well, I think that the record is a mixed bag when it talks about the progress that the Jehovah's Witnesses made. The immigration judge pointed to some positive aspects about registration, but at the time there was a lot of indication that Jehovah's Witnesses were being restricted from registering in many cities, that Jehovah's Witnesses were being arrested, that they weren't able to... Is that in the city where she lived? Yes, Your Honor. There's in the record indicating that Jehovah's Witnesses were not able to register in St. Petersburg. And that's it. 488 in the record. Now, the IJ recognized that Jehovah's Witnesses were discriminated against and said that she had been discriminated against on the basis of... recognized that she had or may have been, but that doesn't rise to persecution that gives rise to an inference that she's going to be persecuted in the future. That's not part of it. Well, the contention is that having been fired from her job and the sexual assault and the threatening phone calls and the threats to psychological commitment and that her child being kicked out of school and beaten up amount to persecution when added up cumulatively. It's not just simply reading the State Department report and saying, some Jehovah's Witnesses have it bad, which is true, but her in particular. And with that, I'd like to reserve the last 45 seconds. Okay. Thank you. Good morning, Your Honors. May it please the Court in order to ask Alicia Schwartz for Respondent Alberto Gonzalez. First of all, her son is back in college and working as well. They reported the incident and the police did not catch the people, but he didn't know who the assailants were. I also assume that counsel is abandoning his arguments to persecution on any other ground, and as well he should, because although she published articles for about 15 years, she continued to have jobs increasing in importance as she went from dock worker to press rep for the regional government. And this was after she was publishing articles and because she was publishing articles, and she even had her own radio program. So we are now down to Jehovah's Witness, and the one act that happened there was a private action by an editor. She was writing articles for two or three magazines, and this woman was trying to buy all the magazines. And she said she wrote articles to fulfill her commitment to Jehovah's Witnesses to proselytize. She didn't like speaking, so she wrote. So she you have already you have she said there are two newspapers in the Soviet Union, excuse me, in Russia. One is the Watchtower and the other is Red Door, or I forget, it was something red that talked about that are Jehovah's Witnesses publications. She's writing, now she's planning to launch a third Jehovah's Witness publication. The articles she writes are for Jehovah's Witnesses. It's a very small target audience. This is a private newspaper. The editor may simply have decided we don't need her articles anymore. Plus, I need to specify she was not fired. She was a freelance correspondent who contributed articles, and she was told they weren't going to be taken anymore. If she's thinking of starting a third Jehovah's Witness magazine, there may be no need for it anymore. Plus the fact, and nobody seems to have noticed this, but when she went to apply for her visa on June 14th, I refer the Court to AR-70 of the record, she had a contract with the Navy, which is a government organization, and that's how she tried to get her So she was not denied employment. She was not harassed by the government. What happened to her as a result of this one incident when she was brought in and locked in a room and sexually assaulted was definitely horrific, but in no way was it State  It was not government-sponsored, authorized. We don't know why it happened. We don't know if the psychologist had the authority to commit her to an institution. We know that she believed it, but that satisfies the subjective ground. The objective evidence is she was assaulted in a room. We don't know why this happened. And just because she said he told her she was a Jehovah's Witness doesn't make it a persecution by a government or by a government agency unwilling to protect her. She never reported the incident. Perhaps she didn't report it because she may have believed that he would turn her over or turn her, but the point is there's no objective evidence that this happened. It is purely subjective on her part, and the fact that counsel admits that the record could go either way means that the record does not compel a finding that she was or would be persecuted on account of her religion. And I would also add that we should have moved to strike the addendum, which he produces an article about Jehovah's Witnesses not being able to practice their religion in Moscow, not in St. Petersburg. Petitioner's activities were related solely to St. Petersburg. She testified that people were arrested after meetings, Jehovah's Witnesses' meetings, in other places and that rents were higher in other places, but she never said that the rent for their particular tsar was higher. She never said that anyone was arrested. Yes, indeed, her son was beaten up, but she didn't say the police were unwilling to help. Did you have a question, Your Honor? I just, did you, I was just going to say, does this, under this record, she had other relatives? Her mother, her mother attends meetings. Her son still attends meetings and apparently has a very lovely job as well as going to the university to study literature. Her cousin attends meetings. It's not great to be a Jehovah's Witness, but she did not suffer persecution by a government agency and nor has she established that she would if she returned. Does the Court have any questions, please? I hate it when you don't have questions. Thank you, Your Honors. Be grateful. I think what distinguishes the mother from the rest of the family is that she was a prominent person, and the record also reflects that the cousin who practices, practices stealthily, and the son has stopped practicing. And the purpose of the persecution was to discourage the practice. The articles that she wrote for, she edited a newspaper that was independent of the three newspapers where she was a freelancer. I think the record got muddled because of some translation issues, but I think it was clarified in the record ultimately that the religious newspaper was a separate newspaper from the three that she was employed with. And with that, I thank the Court. Thank you, Counselor. The case just argued is submitted.
judges: Schroeder, Goodwin, Sedwick